## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST SHORE HOME, LLC, *et al.*, | : | Civil No. 1:22-CV-00204 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CRAIG CHAPPELL, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the motion filed by Plaintiffs West Shore Home, LLC ("WSH") and West Shore Home Holdings, LLC ("Holdings," collectively with WSH, "West Shore"), seeking summary judgment and a permanent injunction. (Doc. 121.)  The motion has been briefed, and, for the reasons provided below, the court will grant in part and deny in part the motion.

## BACKGROUND[1]

WSH operates a home remodeling business with locations throughout the United States including the Mid-Atlantic, Rocky Mountain, Southeast, and Southwest regions.  (Doc. 123, ¶ 2.)  It provides wet area bathroom remodeling and window and door replacement services.  (*Id.* ¶ 3.)  Holdings is the parent company

---

[1] This section of this memorandum includes only the background relevant to the resolution of the motion for summary judgment and permanent injunction.  Any additional factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum.  In considering the instant motion, the court relied on the uncontested facts except as otherwise noted.

of WSH.  (*Id.* ¶ 6.)  WSH hired Craig Chappell on December 3, 2018 as a media manager.  (*Id.* ¶ 7.)  On August 4, 2021, Chappell was promoted to Director of Media.  (*Id.* ¶ 13.)

As part of his work for WSH, Chappell was instrumental in developing various documents which were integral to WSH's marketing strategy.  These included the "Plan Do Check Act" ("PDCA") tool and the TV Strategic Plan (referred to as the "Marketing Workbook").  (*Id.* ¶¶ 25–29.)  WSH limits access to the PDCA, Marketing Workbook, and vendor contracts, and only grants access to members of its Marketing Department and Financial Planning and Analysis Team.  (*Id.* ¶ 31.)

On August 4, 2020, Chappell and WSH executed an employment agreement (the "Employment Agreement"), which included a Pennsylvania choice of law provision.  (*Id.* ¶¶ 32, 40; Doc. 121-3, p. 79.)[2]  Chappell received a $5,000 bonus to sign the Employment Agreement.  (Doc. 123, ¶ 33.)  Section 5 of the Employment Agreement includes a non-competition clause, which states:

> Noncompetition and Nonsolicitation. Employee acknowledges and agrees that the contacts and relationships of WSH and its affiliates (including its subsidiaries) with their customers, suppliers, vendors, licensors and other business relations are, and have been, established and maintained at great expense and provide WSH and its affiliates with a substantial competitive advantage in conducting their business. Employee acknowledges and agrees that by virtue of Employee's employment with WSH, Employee will have unique and extensive

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

exposure to and personal contact with WSH's and its affiliates' customers and other business relations, and that he will be able to establish a unique relationship with those persons that will enable him, both during and after employment, to unfairly compete with WSH and its affiliates. Furthermore, the Parties agree that the terms and conditions of the following restrictive covenants are reasonable and necessary for the protection of the business, trade secrets and Confidential Information of WSH and its affiliates and to prevent great damage or loss to WSH and its affiliates as a result of action taken by Employee. Employee acknowledges and agrees that the noncompete, nonsolicit restrictions and nondisclosure of Confidential Information restrictions contained in this Agreement are reasonable and the consideration provided for herein is sufficient to fully and adequately compensate Employee for agreeing to such restrictions.

(a) Noncompetition. During the period of Employee's employment by WSH and for a period of 24 months thereafter (the "Restricted Period"), Employee will not (except on behalf of WSH or its affiliates (including its subsidiaries)), directly or indirectly, in any capacity, be employed by, or participate in (as an owner, shareholder, director, general or limited partner, officer, manager, consultant or agent, or otherwise) any business, firm, corporation, partnership, or other entity which competes with WSH or its affiliates (a "Competitive Business") within two hundred fifty (250) miles of any of the Company's locations as of the date of this Agreement, as well as those added during the term hereof.

(*Id.* ¶ 35.) Under the Employment Agreement, the non-competition restriction would apply if Chappell's employment was terminated for cause. (*Id.* ¶ 36; Doc. 121-3, p. 76.)

In 2021, West Shore offered a small number of its employees an incentive plan whereby employees could acquire equity in the company. (Doc. 123, ¶ 41.) Chappell elected to participate in this plan and, accordingly, executed the Phantom Unit Agreement ("PUA") with Holdings. (*Id.* ¶ 42.) The PUA contained a

Delaware choice of law provision.  (*Id.* ¶ 45.)  It also contained provisions for noncompetition and restrictions regarding the use of proprietary information.  (*Id.* ¶¶ 46–47.)

On October 6, 2021, Chappell's employment was terminated for cause.  (*Id.* ¶¶ 63–64.)[3]  From November 2021 through September 2022, Chappell worked for at least four of WSH's direct competitors within 250 miles of a WSH location.  (*Id.* ¶¶ 112–73.)[4]  These include P.J. Fitzpatrick, LLC ("P.J. Fitzpatrick"), Love Your Bath, LLC ("LYB"), Independent Home, LLC ("Independent Home"), and Dreamstyle Remodeling, LLC ("Dreamstyle").  (*Id.*)

After his employment was terminated, Chappell also obtained WSH's PDCA and Marketing Workbook.  (*Id.* ¶¶ 65–83.)[5]  Chappell then provided one of these documents to LYB.  (*Id.* ¶¶ 121–27.)[6]  Chappell also showed the Marketing Workbook or PDCA to Dreamstyle.  (*Id.* ¶¶ 143, 171.)[7]

---

[3] Chappell admits these facts.  (Doc. 131, ¶¶ 63–64.)  But, in his opposition brief, he contests that his employment was terminated for cause.  (Doc. 130, pp. 1–2.)  In contesting these facts, he cites only his self-serving affidavit.  (*Id.*)  Because Chappell has already admitted these facts, the court deems them uncontested.

[4] Chappell disputes four of the cited paragraphs.  (Doc. 131, ¶¶ 126–27, 133, 171.)  But his denials do not relate to whether he worked for West Shore's direct competitors within the timeframe or geographic region.  Nor are his denials supported by any record evidence other than his own self-serving affidavit.  As a result, the court finds that these facts are established.

[5] Chappell disputes this, but provides no support other than his own self-serving affidavit.  (Doc. 131, ¶¶ 65–83.)  Once again, the court finds that this fact has been established.

[6] Chappell disputes this but relies only on his own self-serving affidavit.  (Doc. 131, ¶ 126.)  Once again, the court finds that this fact has been established.

West Shore filed a complaint against Chappell in the Court of Common Pleas of Cumberland County, Pennsylvania on January 21, 2022.  (Doc. 1; Doc. 1–2.)  The complaint raised causes of action for breach of contract (Counts I & II) and misappropriation of trade secrets in violation of state and federal law (Counts III and IV).  (Doc. 1, ¶ 3.)  On February 11, 2022, Chappell removed the case, asserting federal question jurisdiction for Count IV and supplemental jurisdiction for the other counts.  (Doc. 1, pp. 1–2.)

In its complaint, West Shore alleged that, after leaving its employ, Chappell had violated a covenant not to compete and had retained commercially valuable proprietary information.  On March 22, 2022, the court issued a preliminary injunction by consent of the parties (the "PI").  (Doc. 23.)  In significant part, the PI enjoined Chappell from doing any work for any West Shore competitor for a period of twenty-four months or misappropriating or using any West Shore confidential information or trade secrets.  (Doc. 23, pp. 5–6.)  That same day, Chappell surreptitiously created Evolve Advertising, LLC ("Evolve").  (Doc. 123, ¶ 158–67.)  Through Evolve, Chappell continued performing work for Dreamstyle. (*Id.* ¶¶ 159, 164–65, 167, 170–71.)

---

[7] Chappell disputes this but relies only on his own self-serving affidavit.  (Doc. 131, ¶ 171.) Once again, the court finds that this fact has been established.

On June 2, 2022, following a conference with the parties, the case was referred to Magistrate Judge Carlson for the purpose of conducting a settlement conference.  (Docs. 39, 41.)  The conference was held on August 25, 2021, but settlement was not reached, and negotiations were described as ongoing. (Doc. 51.)  On September 20, 2022, upon discovering the creation of Evolve and Chappell's continued work with Dreamstyle, West Shore filed an emergency motion to request a hearing for civil contempt.  (Doc. 61.)

On October 27, 2022, following a status conference and briefing by the parties, the court scheduled a contempt hearing for March 16, 2023.  (Doc. 71.)  On October 28, 2022, West Shore filed an amended complaint.  (Doc. 73.)  Chappell filed an answer on November 30, 2022.  (Doc. 79.)  The amended complaint raised the same claims as the original, but also added claims against Evolve Advertising, LLC ("Evolve").  Specifically, it added claims of tortious interference with contractual relations (Counts V and VI), misappropriation of trade secrets (Counts VII and VIII) against Evolve, and a conspiracy claim (Count IX) against Chappell and Evolve.  (Doc. 73.)

On March 15, 2023, Chappell filed a Chapter 7 bankruptcy petition, which triggered an automatic stay of this action.  (Doc. 103.)  On July 17, 2023, the court became aware that the bankruptcy court had granted West Shore's motion for relief from the automatic stay.  *In re: Craig R. Chappell*, No. 23-BK-542, Doc. 40

(Bankr. M.D. Pa. July 13, 2023).  On September 29, 2023, West Shore filed the

instant motion for summary judgment and a permanent injunction.  (Doc. 121.)

The parties have briefed the motion and it is ripe.  (Docs. 122, 123, 124, 130, 131,

132.)

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of

the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the

nonmovant' and 'material if it could affect the outcome of the case."  *Thomas v.*

*Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh*

*Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts

in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288

(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher*

*Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence"

or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

While an affidavit based on personal knowledge setting forth "specific facts that reveal a genuine issue of material fact" is sufficient to defeat summary judgment, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)).

## DISCUSSION

West Shore argues that it is entitled to summary judgment on its claims against Chappell for breach of contract.  West Shore asserts that Chappell violated the non-competition and non-disclosure provisions of his Employment Agreement with WSH and the PUA with Holdings.  West Shore also seeks summary judgment on its claims for misappropriation of trade secrets, under state and federal law, and conspiracy.  Lastly, West Shore seeks a permanent injunction.  The court will address these arguments in turn.

### A. Chappell breached the Employment Agreement with WSH.

#### 1. Non-compete Restriction

WSH argues that Chappell has breached the Employment Agreement, which is a valid contract, resulting in damages. (Doc. 122, p. 15.) Because Chappell's employment was terminated for cause, he is subject to the restrictive covenants of his Employment Agreement. (*Id.*) Under Pennsylvania law, such restrictive covenants are enforceable if they are ancillary to an employment relationship, supported by adequate consideration, reasonable in scope and duration and necessary to protect a legitimate business interest of a former employer. (*Id.* (citing *Prudential Ins. Co. of Am. v. Browne*, 2006 WL 8450239, at *4 (M.D. Pa. Jan. 12, 2006)).)

WSH provides well-supported argument that the restrictive covenants at issue in this case are ancillary to the employment relationship, supported by adequate consideration, necessary to protect WSH's legitimate business interest, and reasonable in duration.[8] (*Id.* at 16–18 (citing *Wincup Holdings, Inc. v. Hernandez*, 2004 WL 953400, at *3 (E.D. Pa. May 3, 2004); *WellSpan*, 869 A.2d at 997; *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. And Cas. Ins.*

---

[8] West Shore asserts that the non-compete provision sought to protect its interests in protecting confidential information and trade secrets and to prevent damage or loss to WSH and its affiliates. (Doc. 122, pp. 16–17.) Courts have found that such interests are legitimate in the context of non-compete agreements. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 424 (3d Cir. 2010); *WellSpan Health v. Bayliss*, 869 A.2d 990, 997 (Pa. Super. Ct. 2005).

*Agency*, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997).)  WSH's arguments are based on undisputed facts and sound law.  Chappell does not dispute these findings.

However, the parties do dispute whether the non-compete covenant of the Employment Agreement is reasonable in geographic scope.  WSH argues that the 250-mile restriction is reasonable in light of Chappell's broad geographic purview at WSH.  (Doc. 122, p. 19.)  He oversaw WSH's marketing across every region in which WSH then operated or was in the process of launching operations.  (*Id.*)  WSH further argues that courts applying Pennsylvania law often enforce two-year non-competition covenants with broad geographic scope.  (*Id.* (citing *Capsicum Grp., LLC v. Rosenthal*, 2013 WL 6667822, at *9; *Pulse Techs., Inc. v. Dodrill*, No. CV-07-65, 2007 WL 789434, at *10 (D. Or. Mar. 14, 2007) (finding a two-year nationwide restriction reasonable under Pennsylvania law under the circumstances)).)  So, too, have courts applying the law of other jurisdictions.  (*Id.* at 20 (citing *Chem-Trol, Inc. v. Christensen*, 2009 WL 331625 (D. Kan. Feb. 10, 2009); *Timber Lake Foods, Inc. v. Estess*, 72 So. 3d 521 (Miss. Ct. App. 2011)).)

Chappell argues that this 250-mile restriction is "in practice and intent nationwide" and therefore entirely unenforceable.  (Doc. 130, p. 7 (quoting *Reading Aviation Serv., Inc. v. Bertolet*, 311 A.2d 628 (Pa. 1973) (finding non-compete agreement void where it contained an unlimited geographic scope although a relevant geography could have been specified in the covenant)).)  He

11

argues that the court should treat Chappell as a salesman. And, Pennsylvania courts have held that, for a non-compete to be reasonable in geography, it can reach no farther than an employee's sales territory. (*Id.* at 6 (citing *Boldt Machinery & Tools, Inc. v. Wallace*, 366 A.2d 902, 907 (Pa. Super. Ct. 1976)).) Because WSH provides services within an approximately 90-minute driving distance of each location, Chappell asserts that anything beyond such radius is unreasonable. (*Id.*)

First, the court finds that Chappell's assertion that the non-compete is effectively unlimited in geography is unsupported by the text of the Employment Agreement, law, fact, or common sense. Had Chappell presented any evidence, this argument might be cognizable. For example, Chappell might have cited the number of WSH locations and shown how much of the country would be covered by a 250-mile radius from each location. He has not done so. All he has cited is his own affidavit and the affidavit of a WSH employee, in which the employee states that WSH offers services within a 90-minute driving radius. This alone does not show that the non-compete agreement has a nationwide scope in practice or intent.

Because the court has concluded that the scope of the non-compete is not unlimited, the remaining question for the court is whether the 250-mile radius is reasonable. Pennsylvania courts have found that the "reasonableness of the

temporal and geographic aspects of a restrictive covenant must be determined in light of the nature of the employer's interest sought to be protected." *Boldt Machinery & Tools, Inc. v. Wallace*, 366 A.2d 902, 907 (Pa. Super. Ct. 1976). Where the geographic scope of a restrictive covenant is unreasonable, the court may exercise its equitable powers to "narrow an overly broad restriction." *Adhesives Res., Inc. v. Newsom*, Civil No. 1:15-CV-0326, 2015 WL 1638557, at *6 (M.D. Pa. Apr. 13, 2015) (citing *Sidco PaperCo. V. Aaron*, 351 A.2d 250, 254 (Pa. 1976)).

West Shore argues that the 250-mile restriction is reasonable. It asserts that its restrictive covenants are meant to protect its trade secrets and confidential information to prevent damage or loss to WSH or its affiliates. (Doc. 122, pp. 16–17; Doc. 123, ¶ 35.) It posits that the restrictive covenant is intended to protect a legitimate business interest: preventing Chappell, who was WSH's number-two marketing professional, from using the specialized and intimate knowledge he gained of WSH's marketing methods, processes, costs, contract details, and marketing success rates for the unfair benefit of its competitors. (Doc. 122, pp. 16–18.)

West Shore further argues that, even if the court finds that the geographic scope is overly broad and narrows the scope, it is still entitled to summary judgment. (Doc. 132, p. 8.) That is because it is undisputed that Chappell did

work for West Shore's direct competitors in overlapping geographic service areas. (*Id.* at 8–9.)

Chappell, arguing that the geographic scope of the non-compete is unreasonable, relies heavily on the decision in the *Adhesives* case. But the facts in that case are distinguishable in two important respects: the nature of the employee's work and the geographic scope of the covenant. In *Adhesives*, the employee was in sales and her sales territory was the western half of the United States. 2015 WL 1638557, at *6. Despite having a finite and definable sales territory, her non-compete extended "to anywhere in the world where Plaintiff's products are sold." *Id.* The broad geography of the non-compete was not "roughly consonant" with the employee's duties and was therefore an unreasonable means of protecting the employer's interests. *Id.*

Unlike in *Adhesives*, Chappell's duties were not limited to a subset of the regions where WSH conducted business. Rather, Chappell oversaw WSH's marketing in every geographic region in which it operated. (Doc. 123, ¶¶ 9–12, 15–18.) Chappell even oversaw marketing in locations where WSH had not fully launched yet but was in the process of opening. (*Id.* ¶¶ 22–30.) For those regions in which WSH operated or was in the process of opening, Chappell was responsible for various marketing channels, including television commercials, print advertising, and direct mailing. (*Id.* ¶¶ 12, 15–16, 23–24.)

The court finds that, based on the nature of Chappell's work, a 250-mile restriction is reasonable.  Reasonable minds could disagree on this matter.  But, even if the court were to exercise its equitable powers and narrow the geography, Chappell would have still breached the covenant.  Chappell argues that the 250-mile restriction covers far more area than that in which WSH's competitors do business.  But, by his own estimation, Chappell admits that P.J. Fitzpatrick and LYB, for which he provided services, are WSH competitors.  (*Id.* ¶¶ 114, 116–19, 123–25; Doc. 131, ¶¶ 114, 116–19, 123–25.)  Chappell admits that P.J. Fitzpatrick and LYB are West Shore competitors, regardless of a 250-mile radius. (Doc. 123, ¶¶ 114, 116–19, 123–25; Doc. 131, ¶¶ 114, 116–19, 123–25.)  Thus, his work for them violated the non-compete provision of the Employment Agreement.  In addition, because the court finds that the 250-mile restriction is reasonable, Chappell's work for Independent Home also violates the Employment Agreement, based on the undisputed facts.  (Doc. 123, ¶¶ 135–42.)  Lastly, as the court addresses next in this section, the undisputed facts show that, provided that West Shore's Centennial, Colorado location is covered under the Employment Agreement, Chappell's work for Dreamstyle also violated the Employment Agreement, provided.  (*Id.* ¶¶ 143–48, 151–70, 173.)  Therefore, even if a narrower geographic scope were required to protect West Shore's interests, it would have covered Chappell's work for P.J. Fitzpatrick and LYB in any event.

The final question regarding the terms of the non-compete agreement is whether Centennial, Colorado counts as a WSH location under the terms of the Employment Agreement.  Chappell argues that it is not, and therefore his work for Dreamstyle did not violate the non-compete.  (Doc. 130, p. 3.)  Chappell argues that West Shore had no commercial activities in Colorado prior to Chappell's discharge.  This is clearly false.  Not only was WHS registered to do business in Colorado, for which it had a business address, but it was also engaging in commercial activities there.  (Doc. 123, ¶¶ 21, 23.)  Moreover, Chappell was involved in those activities.  (Doc. 121-3, p. 73.)

WSH had registered to do business in Colorado on August 20, 2021.  (Doc. 123, ¶ 20.)  WSH's Articles of Organization, filed in Colorado, listed its address as Centennial Business Park II 6981 S. Quentin St. Unit D, Centennial, Colorado 80112 US.  (*Id.* ¶ 21.)  WSH's Centennial, Colorado address is under 20 miles from Denver according to Google Maps.[9]

Chappell was involved in WSH's commercial activities in Colorado.  These included engaging vendors and purchasing leads for Denver.  (*Id.* ¶¶ 22–24; Doc. 121-3, p. 73.)  He continued with this work until his last day of employment on October 6, 2021.  (Doc. 121-3, p. 73.)  According to one of Chappell's emails,

---

[9]  The court may take judicial notice of distances between undisputed locations.  *See Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 429 & n.34 (M.D. Pa. 2003) (citing Fed. R. Evid. 201).

WSH officially opened its Denver office on November 18, 2021.  (Doc. 121-3, p. 366.)

The court finds that WSH's activities were sufficient to include its Centennial, Colorado location as a West Shore location at the time Chappell's employment was terminated.

WSH asserts that Chappell's work for P.J. Fitzpatrick, LYB, Independent Home, and Dreamstyle constitutes a breach of the non-competition restriction of the Employment Agreement.  (Doc. 122, pp. 21–22.)  It is undisputed that these are WSH competitors for which Chappell worked after his employment was terminated.  And, these companies operated within 250 miles of a WSH location. (*Id.*)

In passing, Chappell argues that he did not violate the non-competition restriction because the work was not in the same type of advertising or in the same geographic area where Chappell had worked for West Shore.[10]  (Doc. 130, p. 8.) His only citations are a single reference to his self-serving affidavit and a final

---

[10] This argument has several flaws.  First, it is improperly cited.  It cites to Chappell's affidavit, which it locates at Exhibit A of Chappell's response to West Shore's Statement of Material Facts.  (Doc. 13, p. 8.)  But Exhibit A is actually screenshots from YouTube videos purported to consist of the PDCA and commentary related to it.  (Doc. 131-1, p. 8.)  Moreover, even if Chappell had properly located his affidavit, which is located at pages 1–7 of Doc. 131-1, he provides no pin cite to support any of his assertions.  Second, even if Chappell's unsupported assertions were correct, he does not explain, let alone support, why these assertions have legal or factual importance.

reference to *Adhesives*.  (*Id.*)  The court finds that there is no genuine issue of material fact—Chappell breached the covenant not to compete contained in the Employment Agreement by performing work for P.J. Fitzpatrick, LYB, Independent Home, and Dreamstyle.  (Doc. 122, ¶¶ 112–73.)[11]

### 2.  Non-disclosure Restriction

West Shore argues that Chappell breached his nondisclosure obligations in two ways.  First, he impermissibly used WSH proprietary information in his work for P.J. Fitzpatrick, LYB, Independent Home, and Dreamstyle.  Specifically, he obtained WSH's PDCA and Marketing Workbook, which he used to market his services to these competitors.  He also used business connections, vendors, and terms of vendor agreements in his work with these competitors.  Second, Chappell used WSH's confidential information to pursue work with a fifth WSH competitor, K/S Renewal Systems, LLC d/b/a Kitchen Saver ("KitchenSaver"), which ultimately did not hire him.  (Doc. 122, pp. 23–24; Doc. 123, ¶¶ 101–11.)  In his opposition brief, Chappell does not address or contest West Shore's legal or factual assertions.[12]

---

[11] Chappell disputes four of the cited paragraphs.  (Doc. 131, ¶¶ 126–27, 133, 171.)  But his denials do not relate to whether he worked for West Shore's direct competitors within the timeframe or geographic region.  Nor are his denials supported by any record evidence other than his own self-serving affidavit.

[12] In his response to West Shore's statement of facts, Chappell disputes whether his advances with KitchenSaver implicated his use of the PDCA or Marketing Workbook.  (Doc. 123, ¶ 109; Doc. 131, ¶ 109 (citing Doc. 121-3, pp. 175–79).)  But his brief fails to contest that he provided

The court finds that Chappell violated his non-disclosure obligations.  One example of such violations involves Chappell's work with LYB.  He clearly used, and in some instances disclosed to LYB, WSH's proprietary materials.  Those materials undeniably fall under the definition of Confidential Information from the Employment Agreement.  (Doc. 123, ¶¶ 37, 126–27.)  One piece of Confidential Information is the RevShare, which he shared with LYB.[13]  (Doc. 121-3, pp. 265–66.)  In yet another breach of his non-disclosure obligations, the court also finds that Chappell obtained and used the Marketing Workbook after his employment with WSH.  (Doc. 123, ¶¶ 84–86, 126, 171; Doc. 131, ¶¶ 84–86, 126, 171.)[14]

### 3. Damages

Having shown that Chappell breached the enforceable non-competition and non-disclosure provisions of the Employment Agreement, WSH asserts that these breaches resulted in damages.[15]  WSH has engaged an expert to testify to the

---

KitchenSaver with West Shore's figures.  (*Compare* Doc. 122, pp. 23–24 *with* Doc. 130, pp. 9–12.)

[13] It is likely that Chappell breached the non-disclosure covenant in additional ways, but the findings already described above are sufficient to show breach.  Therefore, the court does not further address Chappell's breach.  Further analysis, in addition to being unnecessary, would be quite difficult due to Chappell's poor and sparse briefing.

[14] Chappell denies certain of these facts but provides no support other than his own self-serving affidavit.

[15] At this stage, West Shore seeks only to establish the existence of damages sufficient to warrant summary judgment on its claims.  (Doc. 122, p. 24 n.5.)  If West Shore is granted summary judgment, it intends to proceed to trial to establish a damages amount, including attorneys' fees, should there be any issue of material fact as to the amount of damages incurred.  (*Id.*)

damages Chappell caused.  (Doc. 122, p. 24; Doc. 123, ¶ 186.)  WSH argues that its compensable damages include unjust enrichment for the amounts that Chappell was paid by its competitors and for the value of confidential information that Chappell illicitly obtained from West Shore and used.  (Doc. 122, p. 24.)  It argues that unjust enrichment is a cognizable damage in the Third Circuit. (*Id.* (first citing *Adv. Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 491 (M.D. Pa. 2018); then citing *Fishkin v. Susquehanna Partners, G.P.*, 2007 WL 853769, at *1 (E.D. Pa. Mar. 19, 2007); and then citing *PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co. Ltd.*, 47 F.4th 156, 161–62 (3d Cir. 2022)).)

While unjust enrichment is a cause of action, it is not a basis for damages under a breach of contract claim.  Rather, unjust enrichment is a separate claim brought under one of two theories.  The first is "a quasi-contractual theory of liability, in which case the unjust enrichment claim is pled in the alternative to a breach of contract." *Silva v. Rite Aid Corp.*, 416 F. Supp. 3d 394, 403 (M.D. Pa. 2019).  The other is "a theory based on underlying tortious conduct, in which case the unjust enrichment claim is a companion claim to the underlying tort." *Id.* at 404.  Neither is the case here.  WSH cannot pursue unjust enrichment as damages under its breach of contract claim.

West Shore provides a second argument to show damages.  It asserts that Chappell's own bankruptcy filings indicate that he owes West Shore $1,000,000

because of his conduct at the heart of this suit. (Doc. 122, pp. 24–25 & n.6 (citing *In re Wettach*, 811 F.3d 99, 110 (3d Cir. 2016) (finding that figures provided in bankruptcy petitions are "eligible for treatment as judicial admissions")).) Moreover, Chappell described his liability to West Shore as "Employment Agreement." (*In re Chappell*, Case No. 1:23-bk-00542-HWV, Doc. 10, p. 14.) As in *Wettach*, Chappell's filing is eligible for treatment as a judicial admission. Chappell's own filing indicates that his liability is to WSH for the Employment Agreement. The court makes no finding as to the amount of damages WSH incurred due to Chappell's breach. But Chappell's judicial admission is sufficient to establish that his breach of the Employment Agreement resulted in damages. Therefore, the court will grant WSH summary judgment for its breach of contract claim.

### B. Chappell breached the PUA.

West Shore argues that Chappell has breached the PUA. It argues that the PUA's Delaware choice of law provision is enforceable under Pennsylvania law. (Doc. 122, p. 25 n. 7 (citing *Cipolla v. Shaposka*, 267 A.2d 854, 855 (Pa. 1970); *Griffith v. Uited Air Lines, Inc.*, 203 A.2d 796, 802–06 (1964)).) In accordance with Pennsylvania law, and the Second Restatement of Contracts, West Shore argues that Delaware law applies. (*Id.*) Chappell does not acknowledge, let alone respond to, the choice of law issue or authorities cited. But the court finds West

Shore's arguments to be properly supported.  Therefore, the court will apply

Delaware law when determining whether Chappell breached the PUA.

Under Delaware law, breach of contract claims require "(1) the existence of

a contract, express or implied; (2) breach of an obligation imposed by the contract;

and (3) damages."  *Williams v. Progressive Direct Ins. Co.*, 631 F. Supp. 3d 202,

213 (D. Del. 2022).  To enforce a restrictive covenant, like those in the PUA,

Delaware courts have required plaintiffs to show that the covenants (1) meet

general contract law requirements of mutual assent and consideration, (2) are

"reasonable in scope and duration, both geographically and temporally, (3)

advance a legitimate economic interest of the party enforcing the covenant, and (4)

survive a balance of the equities."  *Am. Homepatient Inc. v. Collier*, No. Civ.A.

274-N, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006).

Delaware courts have held that "continued employment of an employee

whose position is terminable at will constitutes sufficient consideration to support

an enforceable contract."  *Res. & Trading Corp. v. Powell*, 468 A.2d 1301, 1305

(Del. Ch. 1983).  In this instance, Chappell was an at-will employee, and worked

for more than six months following the execution of the PUA.  (Doc. 123, ¶¶ 42,

63.)  Therefore, West Shore argues, the PUA was supported by adequate

consideration.  (Doc. 122, p. 27.)

Chappell does not respond to, or even acknowledge, any of these legal authorities which West Shore cites.  Rather, he asserts, citing only his own affidavit, that the PUA fails for lack of consideration.[16]  (Doc. 130, p. 8.)  This is not sufficient.

West Shore is correct regarding Delaware law.  Chappell's continued at-will employment was sufficient consideration.  West Shore additionally points out that Chappell received Phantom Units as additional consideration for the restrictive covenants.  (Doc. 122, p. 27; Doc. 123, ¶ 44.)  Chappell admitted this fact.  (Doc. 131, ¶ 44.)  Chappell argues, once again, without any support other than his own affidavit, that this does not qualify as consideration.  (Doc. 130, pp. 8–9.)  The court finds that the PUA is enforceable and supported by sufficient consideration. Based on the facts and arguments presented, West Shore's assertions are supported by law and fact.  And the court concludes that any arguments Chappell has failed to raise are waived.  *Morgen v. Oswood Constr. Co., Inc. v. Nationwide Life Ins. Co.*, CIVIL ACTION NO. 13-666, 2022 WL 3042764, at *6 (E.D. Pa. Aug. 1, 2022) ("[A] a party's failure to address arguments waives the opportunity to contest summary judgment on those grounds[.]") (describing a holding of *Hackett v. Cmty.*

_____

[16] The court assumes that Chappell's counsel recognizes that Chappell's affidavit is not a source of legal authority.  In any case, the slapdash nature of this argument, and of Chappell's brief in general, gives the court serious pause.  Counsel would do well to take seriously their obligations to provide competent, diligent representation and present only nonfrivolous arguments to the court.

*Behav. Health*, No. Civ.A. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005)).

Next, the court addresses whether the PUA's restrictive covenants are reasonable in duration.  As West Shore notes, "Delaware courts have routinely found restrictive covenants with a duration of two years to be reasonable in duration."  (Doc. 122, pp. 27–28 (quoting *TP Group-CI, Inc. v. Vetecnik*, Civil Action No. 1:16-cv-00623, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) (citing cases)).)  This is correct, and Chappell does not dispute it.  The two-year non-compete is reasonable in duration.

West Shore next argues that the PUA's covenants are reasonable in geographic scope.  As a threshold matter, West Shore points out that, when assessing the reasonableness of this provision as with the entire PUA, it is relevant that Chappell's participation in the PUA was entirely voluntary.  (Doc. 122, p. 28; Doc. 123, ¶¶ 41-42.)  West Shore also argues that, although parts of the geographic restriction appear to be broad, there are explicit limitations in the text of the agreement.  (Doc. 122, pp. 28–29.)  Specifically, it prohibits Chappell from directly or indirectly owning or being in business with any business "that engaged in any business which competes in any material respect with any portion of" WSH "anywhere in the world."  (*Id.* at 29.)  In this regard, it is relevant that WSH only

provides three services, all related to the home remodeling space: "wet area bath replacement, window and door replacement." (*Id.*)

The Delaware Chancery Court has previously concluded that "the absence of a geographical limitation does not render [a] restrictive covenant unenforceable per se." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002) (quoting *Gas Oil Prods., Inc. of Del. V. Kabino*, 1987 WL 18432, at *2 (Del. Ch. Oct. 13, 1987)). Furthermore, "[r]estrictions that disallow activities that are 'in competition with' or involve 'soliciting' customers of the employer . . . inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement." *Id.* at *13.

In this context, the PUA provision inherently establishes a geographic limit by prohibiting only ownership in or work with a business engaged in competition with WSH. Given the narrow set of services WSH provides, the court finds the non-compete provision reasonable. It would allow Chappell to perform services in any geographic area for companies that provide goods of any sorts or services other than remodeling wet bath replacement, or window and door replacement.

The PUA contained restrictions for non-competition and non-disclosure provisions.  (Doc. 123, ¶¶ 46–47.)  The latter prohibits the use or disclosure of Proprietary Information, which is defined in significant part as follows:

> The name or address of any customer, supplier or affiliate of the Company or any information concerning the transactions or relations of any customer, supplier or affiliate of the Company or any of its partners; (b) any information concerning any product, service, technology or procedure offered or used by the Company, or under development by or being considered for use by the Company; (c) any information relating to marketing or pricing plans or methods, capital structure, or any business or strategic plans of the Company, (d) any Inventions covered by Section 5 of the Award Agreement, and (e) any other information which the Board has determined by resolution and communicated to the Participant in writing to be Proprietary Information for purposes hereof[.]

(*Id.* ¶ 47; Doc. 123-3, p. 14.)

The same conduct at issue in the Employment Agreement is implicated in the non-compete and non-disclosure provisions of the PUA, and Chappell breached both restrictions of the PUA.  The court finds that Chappell breached the non-competition restriction of the PUA by working for P.J. Fitzpatrick, LYB, Independent Home, and Dreamstyle.  (Doc. 122, ¶¶ 112–73.)[17]  And he breached the non-disclosure restriction by using and in some instances disclosing West Shore's proprietary information, such as its Marketing Workbook and RevShare

---

[17] Chappell disputes four of the cited paragraphs.  (Doc. 131, ¶¶ 126–27, 133, 171.)  But his denials do not relate to whether he worked for West Shore's direct competitors within the timeframe or geographic region.  Nor are his denials supported by any record evidence other than his own self-serving affidavit.

Contract.  (Doc. 123, ¶¶ 84–86, 126, 171; 121-3, pp. 265–66; Doc. 131, ¶¶ 84–86, 126, 171.)[18]

However, West Shore fails with respect to damages.  It provides no additional factual or legal basis for damages under the PUA than it did under the Employment Agreement.  As the court noted above, unjust enrichment is not a basis for breach of contract damages.  And Chappell's bankruptcy filings make no mention of the PUA.  Rather, they solely address the Employment Agreement.[19] While West Shore may well have compensable damages, it has not established them at this point.  Therefore, the court finds that West Shore has established that the PUA is an enforceable contract which Chappell breached.  But, because West Shore has failed to prove damages, the court shall deny summary judgment regarding the PUA.

### C. Misappropriation of trade secrets

West Shore asserts that Chappell misappropriated its trade secrets in violation of state and federal law.  Both state and federal statutes, known as the PUTSA and the DTSA, "are substantially similar."  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 n.19 (3d Cir. 2021).

---

[18] Chappell disputes some of these facts, but relies solely on his own self-serving affidavit.

[19] It is conceivable, and perhaps likely, that Chappell's bankruptcy filing was referring to claims resulting from his breach of both the Employment Agreement and PUA.  But his filings only mention the Employment Agreement.  The court finds that this ambiguity precludes finding that there is no genuine issue of material fact regarding the damages component of the PUA.

Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" when the owner of that information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  Under the PUTSA, a trade secret is defined as "[i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process" when that information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. Cons. Stat. § 5302.

West Shore argues that "Chappell misappropriated four discrete trade secrets: (a) West Shore's methods and processes; (b) its PDCA; (c) its Marketing Workbook; and (d) its RevShare Contract.  (Doc. 122, p. 37.)  It argues that each of these are trade secrets under the DTSA and PUTSA.  (*Id.*)  Each will be addressed in turn.

### 1.  Methods and processes

West Shore argues that its methods and processes qualify as trade secrets and that other courts have made similar findings.  (Doc. 122, pp. 37–38 (citing *Ideal Aerosmith, Inc. v. Auctorinic USA, Inc.*, 2007 WL 4394447 (E.D. Pa. Dec. 13, 2007); *Cerro Fabricated Prods. LLC v. Solanick*, 300 F. Supp. 3d 632 (M.D. Pa. 2018)).)  These cases are distinguishable.

The Third Circuit has found that "the subject matter of the trade secret must be described with sufficient particularity to . . . permit the defendant to ascertain at least the boundaries within which the secret lies."  *Mallet*, 16 F.4th at 382 (internal quotation omitted).  In *Aerosmith*, the trade secrets related to specific emails.  2007 WL 4394447, at *8.  Such specificity is not present where West Shore seeks to generally designate "methods and processes" as trade secrets.  In *Solanick*, it was undisputed by the defendant that the information at issue constituted trade secrets. 300 F. Supp. at 650.[20]  Here, Chappell vigorously disputes whether anything constitutes a trade secret, though he is often remiss in supporting his arguments. Nonetheless, the court finds that the "methods and processes" which West Shore

---

[20]  West Shore also cites other cases in support of its assertion that its methods and processes are protected trade secrets.  (Doc. 122, p. 38.)  But these cases, in addition to being nonbinding on this court, were made in different jurisdictions, and predate *Mallet*.  The court finds that *Mallet* precludes finding that West Shore's nebulous "methods and processes" are trade secrets. Therefore, it will not address the additional nonbinding cases that West Shore cites.

seeks to protect as trade secrets are not described with sufficient particularity to qualify as trade secrets under *Mallet*.

### 2.  The PDCA, Marketing Workbook, and RevShare Contract

West Shore argues that the contents of the PDCA are trade secrets: "(1) the identity of WSH's marketing vendors; (2) how much WSH spent in each market for each advertising source; (3) the success rate for various marketing campaigns; and (4) the bottom-line value for each marketing channel by geographic region." (*Id.* at 39.)  This included not only WSH's advertising costs, "in each product category, in a particular market," but also the "number of calls/leads WSH received for each of those advertisements, again in each market; the number of appointments set and issued as a result of those advertisements, in each market; the net sales tied to each of those advertisements, again in each market; and the gross sales for each market."[21]  (Doc. 123, ¶ 70.)  West Shore argues that the PDCA would be valuable to competitors and allow them to see WSH's marketing budget, methodology, success rates, and cost per call.  (*Id.* ¶ 74.)  It would also allow competitors to identify the most effective media channels for various product lines. (*Id.* ¶ 75.)  The Marketing Workbook similarly contains WSH overall and ad-specific budget and costs, success rates for various marketing campaigns, and the value for each of its marketing channels by region.  (*Id.* ¶¶ 28–29, 84–97.)

---

[21] Chappell denies these facts but relies only on his own self-serving affidavit.  (Doc. 131, ¶ 70.)

While some information contained in the PDCA and Marketing Workbook might be otherwise ascertainable by third parties, most is not. The court finds, based on the record presented by the parties, that there was independent economic value in WSH's advertising spend, the success rates for its marketing campaigns, and the values for its various marketing channels by region. This value came from the information not being generally known to or ascertainable by proper means by others who could obtain economic value from their disclosure. The PDCA and Marketing Workbook qualify as trade secrets under the PUTSA and DTSA.

West Shore asserts that the RevShare Contract includes the terms of WSH's contracts with its marketing vendors. (Doc. 122, p. 42.) It argues that, therefore, the RevShare Contract is a trade secret for the same reasons as the PDCA and Marketing Workbook. (*Id.* at 41–42.) But this similarity is not apparent to the court.

West Shore argues that its RevShare Contract contains pricing information which has been recognized as a trade secret. (*Id.* (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 107–08 (3d Cir. 2001)).) In *Bohler*, the court observed that "client lists and profiles, pricing information, and shipping-to information" can be a trade secret under Pennsylvania law. 247 F.3d at 107–08. But the court in *Bohler* did not find a trade secret. Nor has West Shore pointed to any other case in which a single contract constitutes a trade secret. Lastly, unlike

31

the PDCA or Marketing Workbook, it is not apparent to the court that the RevShare Contract is not readily ascertainable by other means.  The PDCA and Marketing Workbook contain information that would apparently only exist in West Shore's possession.  This includes West Shore's advertising spend, success rates, and value rates.  By contrast, West Shore has not demonstrated that its RevShare Contract could not be obtained from one of West Shore's vendors.

### 3.  Protection of the PDCA and Marketing Workbook

West Shore represents that it has taken efforts that are reasonable under the circumstances to maintain the secrecy of the PDCA and Marketing Workbook.[22] As noted above, the PDCA and Marketing Workbook can only be accessed by WSH's Marketing Department and Financial Planning and Analysis Team.  (Doc. 123, ¶ 31.)  West Shore also protects them through its employment and equity sharing agreements and its employee handbook.  (*Id.* ¶¶ 35, 37, 46, 52; Doc. 121-3, pp. 87–94.)

Chappell argues, once again without any support except a single citation to his own affidavit, that the documents at issue were not trade secrets or in any way protected from disclosure.[23]  (Doc. 130, pp. 10–12.)  West Shore has carried its

---

[22] West Shore's assertions pertain to all of its purported trade secrets.  But the court only addresses the PDCA and Marketing Workbook, because West Shore has not shown that its methods and processes or RevShare Contract otherwise qualify as trade secrets.

[23] Specifically, citing his own affidavit, Chappell argues that West Shore disclosed its Marketing Workbook to television stations and competitors.  (Doc. 130, p. 10.)  Lacking even citation to his

burden and shown on the record the efforts it has undertaken to protect the PDCA and Marketing Workbook.  In this respect, Chappell has failed to set forth specific facts showing that there is a genuine issue.  Nor has Chappell provided other legal authority to dispute the sufficiency of West Shore's methods.  The court finds that West Shore has established that it took reasonable efforts to protect the secrecy of the PDCA and Marketing Workbook.

### 4.  Misappropriation and damages

The court finds that West Shore has established that Chappell improperly acquired the PDCA and Marketing workbook after his employment was terminated.  (Doc. 123, ¶¶ 65, 84.)  The court further finds that he disclosed them to West Shore's competitors.  (*Id.* ¶¶ 126, 171.)

West Shore asserts that Chappell's misappropriation was willful and malicious.  (Doc. 122, pp. 43–44.)  Therefore, it seeks exemplary damages up to two times its lost profits, unjust enrichment damages, and attorneys' fees under federal and state law.  (*Id.* (citing 18 U.S.C. § 1836(b)(3)(C), (D); 12 Pa. Cons. Stat. § 5304(b); 12 Pa. Cons. Stat. § 5305(3)).)  Chappell does not respond to or even acknowledge this argument.  The court deems Chappell to have waived this issue.  Therefore, West Shore may pursue exemplary damages up to two times lost

---

own affidavit, he argues that the RevShare Contract is publicly available information and that no efforts are made to keep the PDCA secret.  (*Id.* at 10–11.)

profits, unjust enrichment damages, and attorneys' fees under federal and state law. West Shore included these damages in its amended complaint, and they are available under the relevant federal and state statutes. (Doc. 73, pp. 43–44, 48–49.)

Even if Chappell had not waived the issue, West Shore could likely pursue these damages. West Shore has provided extensive facts to show that Chappell acted willfully and maliciously to misappropriate the PDCA and Marketing Workbook. (Doc. 122, p. 44 (citing Doc. 123, ¶¶ 112, 121, 139, 143–76, 178, 182).) West Shore has shown that Chappell contacted West Shore employees to obtain the PDCA and Marketing Workbook and provided them to competitors. He took further steps to evade West Shore's detection in his work for Dreamstyle, to which he also disclosed trade secrets. Thus, even if the issue were not waived by Chappell, West Shore easily prevails on this issue. The court finds that West Shore is entitled to summary judgment on its claims of misappropriation of trade secrets with respect to the PDCA and Marketing Workbook.

### D. The court will not grant summary judgment for conspiracy.

West Shore argues that Chappell conspired with Evolve for the purpose of breaching Chappell's non-compete agreements. (Doc. 122, p. 45.) To prove civil conspiracy under Pennsylvania law, a plaintiff must establish three elements. *Strickland v. Univ. of Scranton*, 700 A.2s 9790, 987–88 (Pa. Super. Ct. 1997). The

first element is "a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose." *Id.*

This requirement is not met when a single person acts as both conspirators. For example, a person cannot conspire with a business for which he is the sole owner. *Sullivan v. Rankin*, 2017 WL 4544619, at *9 (M.D. Pa. Sept. 29, 2017).

> Generally under Pennsylvania law, a corporation cannot conspire with itself nor with its officers and agents when they act solely for the corporation and not on their own behalf. However, a corporation can conspire with its agents or employees if the agents or employees are acting not for the corporation, but for personal reasons and one of the parties to the conspiracy is not an agent or employee of the corporation. This rule has been liberally construed, however, so as to allow a civil conspiracy claim to proceed where agents or employees act outside of their corporate roles even if the absence of a co-conspirator from outside the corporation.

*Tyler v. O'Neill*, 994 F. Supp. 603, 613 (E.D. Pa. 1998) (citing *Johnston v. Baker*, 445 F.2d 424, 426–27 (3d Cir. 1971).

West Shore argues that the first element is met here, because Chappell was acting in his own interest and not in the interest of Evolve. (Doc. 132, pp. 20–21.) But neither *Tyler* nor *Johnston* provide that Evolve can suffice as Chappell's co-conspirator.[24] Nor has West Shore argued that the co-conspirator is any person

---

[24] West Shore argues that, because Chappell was acting in his own interest, and not that of Evolve, he can serve as both conspirators—himself and Evolve. But, *Tyler*, on which West Shore relies does not support this. *Tyler* allows for co-conspirators to form a conspiracy in the absence of a co-conspirator from outside the corporation. In that case, a husband and wife were co-conspirators. *Tyler*, 994 F. Sup. at 613.

other than Evolve.  Because West Shore has failed to identify a co-conspirator, nor shown another person who acted with a common purpose, the court will deny summary judgment for civil conspiracy.

### E. Permanent Injunction

West Shore asks the court to permanently enjoin Chappell from competing with West Shore or misappropriating or using its confidential information or trade secrets.  (Doc. 121-1, pp. 6–7.)  To meet its burden and establish that it is entitled to a permanent injunction, West Shore must demonstrate these four elements:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Elements one and two "typically constitute two sides of the same inquiry, for the 'availability of adequate monetary damages belies a claim of irreparable injury.'"  *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019) (citation omitted).

West Shore argues that Chappell should be enjoined because, otherwise, he "could continue his exploitation" of West Shore's trade secrets.  (Doc. 122, p. 46.)  Such continued exploitation would "provide WSH's competitors an unfair economic advantage."  (*Id.*)  West Shore argues that such a loss of trade secrets

establishes irreparable harm sufficient to warrant an injunction.  (*Id.* at 46–47

(citing *Den-Tal-Ez, Inc. v. Siemens Cap. Corp.*, 566 A.2d 1214, 1232 (Pa. Super.

Ct. 1989); *The York Grp., Inc. v. Yorktown Caskets, Inc.*, 924 A.2d 1234, 1243 (Pa.

Super. Ct. 2007)).)  West Shore then proceeds to argue the third and fourth

elements.  (*Id.* at 47–48.)

A district court "may convert an opinion granting a preliminary injunction

into one granting a permanent injunction by expressly recasting its findings and

conclusions in terms of the proper legal standard applicable to a permanent

injunction."  *ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 F. Supp. 2d

676, 682 n.5 (E.D. Pa. 1999).  Here, the court's preliminary injunction was issued

by consent of the parties.  (Doc. 23.)  Based on the representation by the parties,

the court found that the requirements for a preliminary injunction had been met as

required by the federal rules of civil procedure.  (*Id.* ¶ 23.)  But the court did not

make independent and explicit findings and conclusions sufficient to recast now as

a permanent injunction.  The preliminary injunction does not provide sufficient

findings and conclusions to support a permanent injunction.

Nor does West Shore now demonstrate the first two elements of a permanent

injunction—that it has suffered irreparably injury and remedies at law are

inadequate to compensate for that injury.[25]  While West Shore may be able to demonstrate the elements of a permanent injunction, it has not done so yet. Therefore, the court will deny its request without prejudice.

## CONCLUSION

For the reasons stated above, the court will grant in part and deny in part West Shore's motion for summary judgment and permanent injunction. Specifically, the court will grant West Shore summary judgment with respect to breach of the Employment Agreement and misappropriation of trade secrets.  We will deny summary judgment with respect to breach of the PUA and the conspiracy claim, and we will deny without prejudice the request for a permanent injunction. An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: June 12, 2024

---

[25] Because the court finds the first two elements are not met, it terminates the analysis here and does not proceed to the third or fourth requirements.