## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST SHORE HOME, LLC, *et al.*, | : | Civil No. 1:22-CV-00204 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CRAIG CHAPPELL, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Following a hearing, the court found that Defendant Craig Chappell ("Chappell") was in contempt.  Thereafter, the parties submitted briefs regarding appropriate sanctions.  Based on the arguments presented and court's prior factual findings, the court finds that Plaintiffs may recover certain categories of attorneys' fees and costs from Chappell.  But, absent a showing of actual damages, civil contempt does not enable Plaintiffs to pursue disgorgement of profits or unjust enrichment.

### BACKGROUND

Plaintiffs West Shore Home, LLC and West Shore Home Holdings, LLC (collectively "West Shore"), filed a complaint against Chappell in the Court of Common Pleas of Cumberland County, Pennsylvania on January 21, 2022.  (Doc. 1; Doc. 1–2.)  The complaint raised causes of action for breach of contract (Counts I & II) and misappropriation of trade secrets in violation of state and federal law

(Counts III and IV).  (Doc. 1, ¶ 3.)  Chappell asserted that this court had original jurisdiction over Count IV, which arises under federal law, and supplemental jurisdiction to hear the other claims.  (*Id.* ¶¶ 9–10.)  On February 11, 2022, Chappell removed the case.  (Doc. 1.)

As it relates to the present matter, West Shore alleged that, after leaving its employ, Chappell violated a covenant not to compete and retained commercially valuable proprietary information.  On March 22, 2022, the court issued a preliminary injunction by consent of the parties (the "PI").  (Doc. 23.)  The PI enjoined Chappell from "directly or indirectly, being employed by, or performing services for, in any capacity, any competitor of West Shore, for a period of twenty-four (24) months from the date of entry of this Order."  (Doc. 23, ¶ 26(a)).

The PI also enjoined Chappell from possessing any of West Shore's Confidential Information and Trade Secrets.  (*Id.* ¶ 26(f).)  It ordered Chappell to return any Confidential Information and Trade Secrets within five days of the issuance of the PI.  (*Id.* ¶ 26(g).)  The PI adopted the definition of Confidential Information and Trade Secrets provided by Paragraph 33 of the operative complaint.  (*Id.* ¶ 24.)

On June 2, 2022, following a conference with the parties, the case was referred to Magistrate Judge Carlson for the purpose of conducting a settlement

conference.  (Docs. 39, 41.)  The conference was held on August 25, 2022, but settlement was not reached, and negotiations were described as ongoing. (Doc. 51.)

On September 20, 2022, West Shore filed an emergency motion to lift the stay of deadlines and to request a hearing for civil contempt.  (Doc. 61.)  West Shore advised the court that it had become aware that Chappell had violated the PI.

West Shore contended that, although the PI had enjoined Chappell from working at any direct or indirect competitor of West Shore, he had not complied. Prior to and following the entry of the PI, Chappell "was engaged in actions intended to evade detection by West Shore."  (Doc. 133, p. 204.)  Within a day of the PI being issued, Chappell authorized his attorney to create an LLC, Evolve Advertising, LLC ("Evolve"), for the purpose of violating the PI while evading detection from West Shore.  (*Id.*)  Through Evolve, Chappell engaged in business with West Shore's competitor, Dreamstyle.  (*Id.* at 202–03.)  In doing so, Chappell received revenue from which he profited.  (Doc. 134, p. 20.)

On October 27, 2022, following a status conference and briefing by the parties, the court scheduled a contempt hearing for March 16, 2023.  (Doc. 71.) On October 28, 2022, West Shore filed an amended complaint.  (Doc. 73.) Chappell filed an answer on November 30, 2022.  (Doc. 79.)  The amended complaint raised the same claims as the original, but added claims against Evolve Advertising, LLC ("Evolve").  Specifically, it added claims of tortious interference

with contractual relations (Counts V and VI), misappropriation of trade secrets (Counts VII and VIII) against Evolve, and a conspiracy claim (Count IX) against Chappell and Evolve.  (Doc. 73.)

On March 15, 2023, Chappell filed a Chapter 7 bankruptcy petition, which triggered an automatic stay of this action.  (Doc. 103.)  On March 16, 2023, after conferring with counsel regarding the automatic stay, the court continued the contempt hearing.  (Doc. 105.)

On July 17, 2023, the court became aware that the bankruptcy court had granted West Shore's motion for relief from the automatic stay.  *In re: Craig R. Chappell*, No. 23-BK-542, Doc. 40 (Bankr. M.D. Pa. July 13, 2023).  On July 25, 2023, following a status conference, the court rescheduled the contempt hearing for October 5, 2023.  (Doc. 112.)

The contempt hearing was held on October 5, 2023.  (Doc. 125.)  At its conclusion, the court made findings of fact.  The court found that West Shore, as the party moving for contempt, had met its burden of proving contempt. (Doc. 133, p. 200.)

The court found that Chappell violated Paragraph 26(a) of the PI by being "employed by and performing services for a competitor of West Shore, specifically Dreamstyle," from March 30, 2022, through September 9, 2022.  (*Id.* at 203.)  The court also noted that, even by his own testimony, Chappell had admitted to

4

knowingly violating the court's order in this regard from July 1 or July 2 or 2022 until September 2022.  (*Id.*)  The court found that Chappell's violation had been knowing since March, as evidenced by his evasive actions.  (*Id.* at 204.)

The court also found Chappell in contempt for violating Paragraphs 26(f) and (g) of the PI.  (*Id.* at 205–06.)  Specifically, Chappell "clearly possess[ed] copies of West Shore's confidential information and trade secrets," and specifically "TV Strategic Plan and Revenue Share Contract."  (*Id.*)

During the contempt hearing, Chappell acknowledged that the TV Strategic Plan was contained in a Microsoft Excel spreadsheet. (*Id.* at 185.)  The TV Strategic Plan included two different components.  One was a template that could be used to plan regional advertising.  The other was location-specific data by which the template analyzed a specific locale.  (*Id.*)  While Chappell testified that he had no interest in the location-specific data, he wanted the template.  (*Id.*) Using the template from West Shore's TV Strategic Plan allowed Chappell to avoid paying $100,000 for a comparable subscription service.  (*Id.* at 186.)

After the hearing, West Shore submitted its brief requesting contempt sanctions.  (Doc. 134.)  Chappell filed a brief in opposition and West Shore filed a reply.  (Docs. 141, 142.)  The issue is ripe.

### STANDARD OF REVIEW

"Sanctions for civil contempt serve two purposes: 'to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience.'" *Robin Woods Inc. v. Woods*, 28 F.3d 396, 400 (3d Cir. 1994) (quoting *McDonald's Corp. v. Victory Invs.*, 727 F.2d 82, 87 (3d Cir.1984). As the Third Circuit has stated, "attorneys' fee awards are remedial and designed to compensate complainants for losses incurred as a result of the contemnors' violations." *Id.* at 401 (quoting *Roe v. Operation Rescue*, 919 F.2d 857, 869 (3d Cir. 1990) (internal quotation marks omitted). Monetary contempt sanctions must have some basis in the record. *Lichtenstein v. Lichtenstein*, 425 F.2d 1111, 1113–14 (3d Cir. 1970). The "fine imposed for civil contempt" may "not exceed the actual damages caused the offended party by a violation of the court's order." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 975 (3d Cir. 1982). And the "sanction imposed on a civil contemnor for his past conduct may not exceed the actual damages caused by his violation of the court's order." *McDowell v. Phila. Hous. Auth*, 423 F.3d 233, 240 (3d Cir. 2005).

Although the Third Circuit has not directly addressed what evidentiary standard applies to contempt sanctions, federal courts in Pennsylvania have followed the lead of other circuits and applied a preponderance of the evidence standard. *Cardionet, LLC v. MedNet Healthcare Techs., Inc.*, 146 F. Supp. 3d 671,

692–93 & n.24 (E.D. Pa. 2015); *McNulty v. Middle East Forum*, 2021 WL 510277, at *2 & n.3 (E.D. Pa. 2021).

With respect to attorneys' fees, the Supreme Court has stated that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This method of calculating attorney's fees is frequently called the "lodestar" method. *See Angino v. Transunion, LLC*, No. 17-0954, 2019 WL 8161110, at *2 (M.D. Pa. Nov. 25, 2019). The lodestar method consists of a burden shifting framework in which "[t]he party seeking attorney's fees has the [initial] burden to prove that its request for attorney's fees is reasonable." *Rayna P. v. Campus Cmty. Sch.*, 390 F. Supp. 3d 556, 561 (D. Del. 2019). "To meet its burden, the fee petitioner must submit evidence supporting the hours worked and rates claimed." *Id.* (citation and quotation marks omitted). Once the fee petitioner satisfies their burden, the presumption is that the lodestar is the reasonable fee. *Id.*

At that point, the party seeking an adjustment to the requested amount has the burden of proving that an adjustment is necessary. *Id.* To do so, "the party opposing the fee award [must come forward with] affidavit[s] or [a] brief with sufficient specificity to give fee [petitioner]s notice [they are opposing] the

reasonableness of the requested fee."[1] *Rode v. Dellarciprete*, 892 F.2d 1177, 1183

(3d Cir. 1990).  In short, once a fee petitioner has carried their initial burden, the

party opposing the fee "may contest that prima facie case only with appropriate

record evidence." *Smith v. Phila. Housing Auth.*, 107 F.3d 223, 225 (3d Cir.

1997).  "In determining whether the number of hours claimed is reasonable, the

court may divide the claimed hours according to the type of work performed."

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2014 WL

2860863, at *6 (M.D. Pa. June 23, 2014), *amended*, 2014 WL 2991813 (M.D. Pa.

July 2, 2014), *aff'd*, 612 F. App'x 612 (Fed. Cir. 2015).  Excessive, redundant, or

otherwise unnecessary hours are unreasonable.  *Rode*, 892 F.2d at 1183 (quoting

*Hensley*, 461 U.S. at 433).  Only when the party opposing a fee award has met this

burden can a court consider whether to exercise its discretion and adjust the

requested amount of fees.  Therefore, where "the party opposing the fee award

does not meet its burden, the court must award the attorneys' fees at the requested

rate." *Red Roof Franchising LLC, Inc. v. AA Hosp. Northshore, LLC*, 937 F. Supp.

2d 537, 564 (D.N.J. 2013).

---

[1] The court in *Rode* stated that this framework applied specifically to "statutory fee" cases.  892 F.2d at 1183.  But some courts have applied the same standard to a context of civil contempt. *See Apple Corps. Ltd. v. Int' Collectors Soc.*, 25 F. Supp. 2d 480, 485 (D.N.J. 1998).

**DISCUSSION**

Plaintiffs seek three types of sanctions.  First, they request attorneys' fees and costs.  (Doc. 134, pp. 8–13.)  Second, they request damages related to Chappell's retention and commercial use of Plaintiffs' proprietary information. (*Id.* at 13–19.)  Lastly, they request an award of Chappell's profits from his work with Dreamstyle.  (*Id.* at 19–20.)

### A. The court will award attorneys' fees and costs.

Plaintiffs seek to recover four categories of attorneys' fees and costs, which they assert they incurred due to Chappell's violation of this court's order.  First, they seek fees incurred to determine the extent to which Chappell violated the court's order.  (*Id.* at 10.)  Second, they seek fees incurred in preparing for the contempt hearings.  (*Id.* at 11.)  Third, they seek fees related to reviewing electronically stored information ("ESI"), which they assert was necessary due to Chappell's failure to produce discovery and his dishonesty during his sworn deposition.  (*Id.*)  Fourth, they seek fees incurred through preparing for and attending a settlement conference, which Chappell attended in bad faith while secretly violating the court's order.  (*Id.* at 12.)  West Shore's counsel provided a declaration by attorney Thomas Collins in support of West Shore's request for attorneys' fees along with a table of fees and costs.  (Doc. 134-1, pp. 14–57.)

With respect to attorneys' fees, West Shore seeks $81,508.50 for contempt hearing preparation, $294,483.50 to investigate the contempt, $26,470.50 for ESI, and $7,990.00 related to the settlement conference.  (Doc. 134-1, pp. 20–56.)

### 1.  Categories of fees.

Because a court may only award contempt sanctions for damages caused by a contemnor's conduct, the court will only award fees and costs for litigation which resulted from Chappell's actions.  Therefore, before addressing the reasonableness of the fees sought or other arguments, the court will look to whether the categories of attorenys' fees sought were caused by Chappell's conduct.  But, as noted above, the court may not limit fees based on arguments not made.

The first two categories sought are clearly caused by Chappell's conduct.  They relate to investigating Chappell's conduct in violation of the PI and preparing for the contempt hearings.  But for Chappell's contempt of this court's order, such legal work would not have been required.  Therefore, West Shore may pursue these fees and costs.

The third and fourth categories are a closer call.  Regarding the third category, revise of ESI, West Shore argues that it incurred these fees "because Chappell failed to produce relevant discovery and lied in his discovery responses and at his deposition."  (Doc. 134, p. 11.)  West Shore had previously documented

some of these deficiencies in a discovery letter it docketed on December 30, 2022.

(Doc. 86.)  And, at the contempt hearing, the court made a factual finding that

Chappell had provided false information, and failed to provide required

information, through written discovery.  (Doc. 133, pp. 204–05.)  Therefore, West

Shore argues, its ESI review was the only effective discovery during a months-long

period in which Chappell failed to produce any discovery.  (Doc. 134, p. 11.)

Furthermore, the ESI is what proved that Chappell had retained West Shore's

proprietary information in violation of the PI.  (*Id.* at 11–12.)

Although Chappell contests that ESI costs were caused by his contempt, he

does not dispute ESI-related attorneys' fees on that basis.[2]  (Doc. 141, p. 8.)

Because Chappell does not address ESI fees, regarding causation or otherwise, the

court deems him to have waived the matter.   Therefore, the court will only assess

whether the contested costs were caused by Chappell's contempt of the PI.

Chappell argues that ESI discovery would have been completed in West Shore's

case in chief regardless of his conduct.  (*Id.*)

---

[2] West Shore charitably characterizes Chappell's brief as contesting both fees and costs related to
ESI.  (Doc. 142, p. 9.)  But Chappell's brief only directly addresses ESI fees.  The one exception
is that Chappell contests "fee listings" which include "'Lit Tech Support' entries that pre-date the
contempt hearing by months."  (Doc. 141, p. 8.)  Chappell does not articulate the basis for this
objection.  Therefore, the court is unable to determine whether it relates to causation or
reasonableness of the fees.  Because Chappell has failed to put West Shore on notice of the basis
for this objection, the court overrules it.

In response, West Shore concedes that "ESI discovery was contemplated in this litigation." (Doc. 142, p. 9.) But West Shore asserts that it only conducted ESI later, when Chappell's contempt came to light and ESI discovery was required as a result of Chappell's "contempt and lack of candor." (*Id.*)

The court finds that West Shore has not shown that its ESI costs were caused by Chappell's contempt. The tables West Shore has submitted already separate ESI discovery from discovery and investigation related to uncovering and documenting Chappell's contempt. Thus, ESI discovery was not directly related to investigating Chappell's contempt. And, West Shore concedes that ESI discovery was already contemplated in this action before the suspected contempt.

Based on West Shore's allegations in its complaint, ESI discovery would seem inevitable in this case. West Shore claims that Chappell misappropriated trade secrets, which took the form of digital files. (Doc. 73, ¶¶ 125–37.) The sole fact that ESI discovery costs could have been avoided if the case had settled does not render them compensable as a direct result of Chappell's contempt. Therefore, West Shore may not pursue costs related to ESI discovery as a sanction for contempt.

Lastly, West Shore argues that Chappell's contempt led West Shore to attend a settlement conference under false pretenses. (Doc. 134, pp. 5–6.) The argument is that Chappell attended in bad faith, while he was secretly violating the

PI by conducting business with Dreamstyle.  (*Id.* at 12.)  Chappell failed to disclose his dealings with Dreamstyle in discovery, and his conduct only came to light during the conference when West Shore was able to review his phone records. (Doc. 142, p. 8.)

Chappell contests that his deceit or contempt led to West Shores fees and costs related to the settlement conference.  He asserts that the conference would have taken place with or without his contempt.[3]  (Doc. 141, p. 7.)

Based on the court's factual findings at the contempt hearing, the court is convinced by West Shore's argument that Chappell attended the settlement conference in bad faith.  As a result of Chappell's bad faith, West Shore attended the settlement conference under false pretenses.  The court finds by a preponderance of the evidence that, because of Chappell's contempt, West Shore expended fees and costs to prepare for and attend a settlement conference that was a sham.  Had West Shore been aware of Chappell's contempt at the time, they would certainly not have pursued negotiations with him.

---

[3] Chappell also questions whether a lack of contempt would have changed the outcome, given that West Shore made no settlement demand at the conference.  (Doc. 141, p. 2.)  But, as West Shore points out in reply, such evidence is inadmissible pursuant to Federal Rule of Evidence 408.  (Doc. 142, p. 8.)  Moreover, if it were admissible, West Shore represents that the reason it made no offer at the conference is that it submitted a demand to Chappell ahead of the conference.  (*Id.*)

Chappell's arguments are unavailing.  He argues that, absent his contempt, there would have been a settlement conference anyway.  That is uncontested.  But, in that instance, West Shore's preparations for and attendance at the conference would not have been under false pretenses.  And there would have been some chance for settlement.  Here, Chappell strung West Shore along in bad faith while actively violating this court's order.  The court finds that West Shore's settlement fees and costs were caused by Chappell's contempt.  Therefore, West Shore may pursue this fourth category.

For the reasons stated above, West Shore may pursue attorneys' fees and costs related to the first, second, and fourth categories.  West Shore may additionally pursue attorneys' fees but not costs related to the third category.

### 2.  Reasonableness of the billing rates.

Chappell argues that the affidavit West Shore has presented is insufficient to show that the rates it charged were reasonable in the market.  (Doc. 141, p. 8 (citing *Horizon Unlimited, Inc. v. Silva*, 2002 U.S. Dist. LEXIS 15332, at *5 (E.D. Pa. Aug. 15, 2002)).)  In response, West Shore asserts that the rates it seeks are within the fee schedule of Community Legal Services of Philadelphia ("CLS"), which this court has previously found instructive in determining reasonable attorneys' fees.  (Doc. 142, p. 5 (citing Attorney Fees, Community Legal Servs., https://clsphila.org/about-community-%20legal-services/attorney-fees/; citing also

*Harrison v. Brew Vino*, LLC, No. 1:20-CV-00666, 2021 WL 4150551, at *2 (M.D. Pa. Sept. 13, 2021); *Benjamin v. Dep't of Pub. Welfare of Com. of Pennsylvania*, 2014 WL 4793736, at *8 (M.D. Pa. Sept. 25, 2014); *Brown v. TrueBlue, Inc.*, 2013 WL 5947499, at *2 (M.D. Pa. Nov. 5, 2013)); *Paulus ex rel. P.F.V. v. Cordero*, 2013 WL 432769, at *8 (M.D. Pa. Feb. 1, 2013).)

West Shore has requested fees for attorneys Collins, Myirski, Morrison, Sparacino, Gabler, Fleming, and Gillis, as well as paralegal Sunchych. (Doc. 134-1, pp. 20–57.) West Shore provided information via declaration showing that fees for attorneys Collins, Myirski, and Sparacino, as well as paralegal Sunchych were billed at reasonable rates. Based on their years of experience and areas of expertise, each of these individuals have hourly billing rates within the CLS fee schedule.

At the earliest date for which fees are sought, Attorney Collins had approximately seventeen years of litigation experience specializing in employment litigation. (Doc. 142-1, pp. 2–3.) His billable hourly rate ranged from $500-$525. (Doc. 134-1, pp. 20–56.) The CLS fee schedule provides that someone with that level of experience may reasonably charge $535-$625 per hour.

Attorney Myirski had approximately seven years of litigation experience specializing in employment litigation. (Doc. 142-1, pp. 3.) Her billable hourly rate ranged from $350-$370. (Doc. 134-1, pp. 20–56.) The CLS fee schedule

provides that someone with that term of experience may reasonably charge $320-$415.

Attorney Sparacino had approximately four years of litigation experience specializing in employment litigation.  (Doc. 142-1, pp. 3–4.)  Her billable hourly rate was $310.  (Doc. 134-1, p. 54.)  The CLS fee schedule provides that someone with her length of experience may reasonably charge $265-$315.

Paralegal Sunchych had approximately fourteen years of experience as a paralegal.  (Doc. 142-1, p. 4.)  Her billable hourly rate was $190-$220.  The CLS fee schedule provides that someone with her length of experience may reasonably charge $245-$285.

The court finds that West Shore has shown the hourly billing rates are reasonable with respect to attorneys Collins, Myirski, and Sparacino, as well as paralegal Sunchych.  Chappell has provided no evidence or further argument which calls into question the reasonableness of the hourly billing rates.

West Shore has provided no information regarding the reasonableness of the rates for attorneys Morrison, Gabler, Fleming, or Gillis.  The court concludes that West Shore has failed to show that rates for attorneys Morrison, Gabler, Fleming, and Gillis are reasonable.  For failing to meet this burden, the court will deny West Shore fees for these attorneys, which total $2,205.00 for attorney Morrison,

$6,429.50 for attorney Gabler, $72.50 for attorney Kiger, $97.50 for attorney Fleming, and $682 for attorney Gillis.[4]

### 3. Reasonableness of the hours requested.

Chappell asserts that various fees are inflated or unreasonable. Most of his allegations are conclusory, lack any citation to the record, and cite only a single inapposite case.[5] But Chappell does properly object to the reasonableness of fees related to the contempt hearing.

---

[4] The fees sought for attorneys Morrison and Gillis relate to discovery for contempt and preparation for the contempt hearing. The fees sought for Gabler, Kiger, and Fleming solely relate to discovery of contempt.

[5] For example, Chappell argues that West Shore's legal fees are inflated considering the straightforward nature of the legal issues. (Doc. 141, p. 6 (citing *Microsoft Corp. v. United Computer Res. Of N.J., Inc.*, 216 F. Supp. 2d 383, 388 (D.N.J. 2002)).) He does not specify which category of fees this argument applies to, but the court assumes that it relates to the contempt hearing, because he refers to a "simple contempt issue." (*Id.*) Chappell argues that the legal fees here are a result of West Shore's "aggressive" litigation strategy. (*Id.*) In response, West Shore distinguishes *Microsoft Corp.* In that case, in addition to the legal issues being neither complex nor novel, the plaintiff had "previously litigated essentially identical cases, and used its prior arguments and judgments extensively in its briefs." 216 F. Supp. 2d at 391. Moreover, while West Shore does not assert that the legal issues in its contempt motion were complex, it asserts that extensive work was required to understand and "overcome Chappell's extreme efforts in hiding his contempt." (Doc. 142, p. 6.) Aside from *Microsoft Corp.*, which is inapposite, Chappell fails to provide any factual or legal basis for this first line of argument.

Similarly, Chappell questions the legitimacy of fees on the basis that the costs to investigate his contempt are more than three times greater than the fees for the contempt hearings themselves. (Doc. 141, p. 6.) In doing so, Chappell provides no substantive analysis and cites no authority.

Chappell also argues that the requested fees are duplicative, "including attendance of multiple high-priced attorneys at the contempt hearing," relying on the *Apple Corps.* decision. (Doc. 141, p. 6.) West Shore counters that *Apple Corps.* is distinguishable. (Doc. 142, pp. 6–7.) In that case, four attorneys attended a hearing. *Apple Corp.*, 25 F. Supp. at 489. Two partners split witness examinations. *Id.* By contrast, West Shore had one partner and one associate at the contempt hearing. (Doc. 142, p. 7.) One conducted examination and the other handled exhibits.

Chappell argues that the fees related to preparation for the contempt hearing are excessive and should be reduced.  Here, West Shore seeks $81,508.50 in fees, comprising approximately 200 hours, in preparation for essentially a one-day hearing.  (Doc. 141, p. 7 (citing *Apple Corp.*, 25 F. Supp. 2d at 491) (finding that a senior partner's 87 hours of preparation for 30 hours of hearing was excessive and thereby reducing the hours compensated by 50%).)[6]  (*Id.*)

West Shore counters that one factor which increased preparation time was the fact that counsel had to prepare twice.  (Doc. 142, p. 7.)  After fully preparing for the contempt hearing initially, it was continued by over six months due to Chappell's filing for bankruptcy protection.  (*Id.*)  Other than this delay, and the resulting need to prepare again, West Shore provides no additional evidence or argument as to why 200 hours are reasonable in preparing for a contempt hearing.  Nor has Chappell provided a specific request for how much these fees should be reduced.  The court finds that it lacks sufficient evidence to determine whether the

---

(*Id.*)  The court finds that *Apple Corp.* is dissimilar.  The court finds that Chappell has not met his burden in raising these arguments.

[6] One portion of Chappell's brief merely states, without argument or explicit objection, the total amount in attorneys' fees that West Shore was billed for discovery of contempt.  (Doc. 141, p. 7.)  Clearly, a mere restatement of the number of hours or dollars billed for a particular category of services does not give a fee applicant notice with sufficient specificity of the basis for an objection.

hours billed in preparation for the contempt hearing were reasonable. Therefore, it will defer ruling on this issue until the parties have provided further briefing.

Lastly, Chappell also argues that certain fees incurred in determining the extent of Chappell's violations of the PI were unreasonable. (Doc. 141, p. 8.) Specifically, he argues that West Shore cannot recover fees for "subpoenas and deposition activity that post-dates by far the original scheduled contempt hearing date." (Doc. 141, p. 8.) He contends that these were conducted "in an effort to bolster the case in chief and convert those fees to contempt related fees." (*Id.*) In support, he argues that "[t]here was no evidence that any contempt occurred after the date Defendant specified he stopped all media buys and those which naturally expired in September 2022." (*Id.*) Chappell provides no additional factual or legal basis for this objection.

Seemingly, Chappell is arguing that this discovery was unreasonable because it occurred after the initial date scheduled for the contempt hearing. The logical or legal basis for this argument is not obvious. West Shore responds by reminding Chappell that its deposition of Jonathan Fawkes and Independent Home, LLC "was contemplated before the first hearing, and it was noted for the Court at the July status conference when the Bankruptcy Court granted Plaintiffs' request for relief from the automatic stay." (Doc. 142, p. 8 n.5.) The court finds that Chappell has failed to meet his burden in raising this objection. Based on

Chappell's brief, it is unclear to the court why he believes discovery conducted after the initial date of the contempt hearing is unreasonable.  He has provided neither a factual nor legal basis for his argument.  Therefore, the court will reject this argument.

### 4.  Miscellaneous arguments.

Chappell argues that "[c]osts were also excessive and not sufficiently documented as functions of contempt relative to the case in chief.  The summary," which West Shore submitted, "gives invoice numbers as they were apparently invoiced, but does not give sufficient justification, and amount to $43,554.82 for 'discovery' of contempt and $10,773.44 'relative' to ESI discovery."[7]  (Doc. 141, p. 8.)  The court does not possess sufficient evidence to rule on the reasonableness of costs related to discovery of contempt.  Therefore, the court will defer ruling as to the reasonableness of costs associated with discovery of contempt and will permit West Shore to submit additional details relating to its discovery costs.  With respect to ESI discovery costs, the reasonableness of these costs is moot, because the court found that these costs were not caused by Chappell's contempt.

---

[7] Of note, Chappell has not argued that the attorneys' fees are insufficiently documented.  Therefore, the court deems Chappell to have waived that argument.

In addition to the arguments described above, Chappell asserts generalized, undeveloped, and mostly unsupported arguments for why the court should not grant the full amount of requested fees and costs.[8]  (Doc. 141, pp. 5–9.)

### B. West Shore cannot pursue disgorgement of profits without a showing of damages.

West Shore asserts that Chappell should be required to surrender the profits he gained by violating the PI.  (Doc. 134, pp. 19–20.) By engaging with Dreamstyle in violation of this court's order, Chappell received $97,635.65.  (*Id.* at 20.)  The only expenses associated with that revenue were $6,070.32, which left Chappell with a profit of $91,565.33.  (*Id.*)  West Shore asserts that these profits should be disgorged.  (*Id.* at 19–20 (citing *Leman v. Krentler-Arnold Hing Last Co.*, 284 U.S. 448, 457 (1932); *Nat'l Drying Machiner, Co. v. Ackoff*, 245 F.2d 192. 194 (3d Cir.), *cert. denied*, 355 U.S. 832 (1957); *NFL Properties LLC v. Wolhfarth*, No. 2:05-cv-67, 2011 WL 1402770 (W.D. Pa. Apr. 13, 2011)).)

Supreme Court precedent would seemingly allow for this recovery.  The court in *Leman*, found as follows:

> There is no question here that the respondent had made profits through the infringing sales in violation of the injunction, and the amount of the

---

[8] For example, without citation or support, Chappell suggests that the invoiced fees may not be legitimate and are instead now requested solely for the benefit of West Shore's counsel.  (Doc. 141, p. 6.)  He also asserts that, as in *Microsoft Corp.*, the court should consider the relative financial strength of the parties.  (Doc. 141, p. 6.)  But he does not develop this argument, analyze *Microsoft Corp.* for support, or present any evidence related to the relative financial strength of the parties.  Because Chappell has not met his burden, the court rejects these arguments.

profits was ascertained, but the appellate court held that the petitioners were limited to the damages caused by such sales and that no damages had been shown.  We think that the court erred in imposing this limitation.  The fact that a proceeding for civil contempt is for the purpose of compensating the injured party, and not, as in criminal contempt, to redress the public wrong, does not require so narrow a view of what should be embraced in an adequate remedial award.

While the distinction is clear between damages, in the sense of actual pecuniary loss, and profits, the latter may none the less be included in the concept of compensatory relief.  In a suit in equity against an infringer, profits are recoverable not by way of punishment but to insure full compensation to the party injured.

284 U.S. at 455–56.  But in its *Ackoff* opinion, the Third Circuit clarified the significance of *Leman*.  245 F. 2d 192.  It concluded that "[w]hether an award in civil contempt be measured in terms of a plaintiff's loss or a defendant's profit, such an award, by very definition, must be an attempt to compensate plaintiff for the amount he is out-of-pocket or for what defendant by his wrong may be said to have diverted from the plaintiff or gained at plaintiff's expense."  *Id.* at 194.  The Circuit concluded that *Leman* "does not relieve the complainant of showing that the contemptuous conduct did, in fact, have substantial injurious effect upon his economic interest."  *Id.*

Here, West Shore concedes that "there was no directly competitive conduct, such that Plaintiffs suffered a direct loss of business because of Chappell's work for Dreamstyle."  (Doc. 142, p. 12.)  West Shore maintains that, even in light of *Ackoff*, the court may still disgorge Chappell's profits because "Plaintiffs' expenses

22

involved filing the Complaint and the negotiation and entry of the [PI]." (*Id.*) Chappell then unjustifiably profited from his work with Dreamstyle in violation [] thereof." (*Id.*)  But *Ackoff* forecloses such disgorgement absent a measurable loss. 245 F.2d at 195.  As the court stated, "there can be no 'equity' in a compensatory award except as it provides a fair equivalent for some loss." *Id.*  Because West Shore has not shown a loss, disgorgement of profits in this context would be punitive.

As the Third Circuit has stated, "[i]t is obvious that a fine exceeding the indemnity to which the complainant is entitled is purely punitive." *Id.* at 193.  The Circuit found that "unless it is based upon evidence showing the amount of the loss and expenses, the amount must necessarily be arrived at by conjecture, and in this sense it would be merely an arbitrary decision." *Id.*  For these reasons, the court will deny West Shore disgorgement of Chappell's profits.

### C. West Shore cannot pursue unjust enrichment damages as a contempt sanction.

West Shore argues that the court should award it damages under an unjust enrichment theory because Chappell retained its trade secrets in violation of the PI and profited by their use.  (Doc. 134, pp. 13–19.)  West Shore points out that, pursuant to Third Circuit precedent, Pennsylvania law allows for an award of unjust enrichment damages not solely for "a profit that was realized," rather it may also award damages for "a cost that was avoided." (*Id.* at 13–14 (quoting *PPG*

*Indus. Inc. v. Jiangsu Tie Mao Glass Co. Ltd.*, 47 F.4th 156, 161–62 (3d Cir. 2022).)

West Shore makes a competent and well-supported legal and factual case for why the court should award unjust enrichment damages for Chappell's retention and use of West Shore's TV Strategic Plan. (*Id.* at 13–19.)  It is clear that Chappell retained the TV Strategic Plan in violation of the PI.  And by Chappell's own testimony, by using the TV Strategic Plan, he saved $100,000 on expenses.[9]  (Doc. 133, pp. 184–86.)

Although West Shore may have a claim for unjust enrichment, that is not an appropriate sanction for civil contempt in the Third Circuit.  *Ackoff*, 245 F.2d 193; *Com v. Charlett*, 391 A.2d 1296, 1303 n.1 (Pa. 1978) (Larsen, J., dissenting).  Therefore, the court will not allow West Shore to pursue unjust enrichment damages as a contempt sanction.

---

[9] In response, Chappell makes a number of arguments that approach frivolous.  As noted above, Chappell admitted under sworn testimony that his use of the TV Strategic Plan saved him $100,000 in costs.  Nonetheless, he now asserts that the TV Strategic Plan provided him "no economic advantage."  (Doc. 141, pp. 9–11.)  According to him, it provided him no benefit and, because West Shore paid no royalties for its creation, there is no claim for unjust enrichment. (*Id.* at 11.)  Because the court finds that unjust enrichment is not an appropriate sanction for contempt, it will not address the deficiencies in Chappell's argument.

## CONCLUSION

For the reasons stated above, West Shore may not pursue costs related to ESI discovery, which were not caused by Chappell's contempt.  In all other respects, West Shore may pursue the attorneys' fees and costs it has submitted.  The rates are reasonable for the fees West Shore has submitted.  Generally, Chappell fails to raise colorable arguments regarding the reasonableness of the fees.  Therefore, the court will allow West Shore to recover them.  This includes $285,818.00 in attorneys' fees for discovery of contempt,[10] $26,470.50 in attorneys' fees related to ESI, $7,990.00 in attorneys' fees related to the settlement conference, and $391.76 in costs related to preparation for contempt hearings.  But Chappell has raised two arguments which the court must consider and for which it requires additional information and briefing.  The court will defer ruling on these issues: (1) whether the hours billed for contempt preparation were reasonable and (2) the reasonableness of the costs West Shore incurred related to discovery of contempt.  An appropriate order will follow.

s/Jennifer P. Wilson_____
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: June 12, 2024

---

[10] This amount, of $285,818.00, represents $294,483.50 which West Shore seeks in fees for discovery of contempt, less $8,665.50 in attorneys' fees for attorneys Gabler, Morrison, Kiger, Fleming, and Gillis.